**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT PIERCE DIVISION**

**CASE NO. 21-14017-CR-CANNON**

**UNITED STATES OF AMERICA**,

    Plaintiff,

v.

**RONELL BERNARD BRYANT, III**,

    Defendant.

_____/

**OMNIBUS ORDER DENYING DEFENDANT'S**
**MOTIONS TO SUPPRESS [ECF Nos. 33, 63, 67]**

    **THIS CAUSE** comes before the Court upon the following three Motions to Suppress filed by Defendant Ronell Bernard Bryant: (1) Motion to Suppress Cell Phone Search and Amended Motion in Support of Same [ECF No. 33 as amended by ECF No. 41]; (2) Motion to Suppress Evidence Obtained Pursuant to Search of Nissan Sedan [ECF No. 63]; and (3) Motion to Suppress Evidence Found During Execution of Search Warrant of Residence and Nissan Sedan [ECF No. 67]. The Government filed Responses in Opposition to the Motions [ECF Nos. 40, 44, 69, 72]. Defendant thereafter filed Replies [ECF Nos. 42, 79, 81]. The Court has reviewed the Motions and the full record. The Court also held two hearings on the Motions—an initial hearing on December 8, 2021 to hear arguments from counsel on Defendant's Motion to Suppress Cell Phone Search [ECF No. 33 as amended by ECF No. 41], which was filed first, and then an evidentiary hearing on January 3, 2022 [ECF Nos. 33, 41, 63, 67], including a *Franks* hearing on Defendant's Motion to Suppress Evidence Found During Execution of Search Warrant of Residence and Nissan Sedan [ECF No. 67].

    Following a complete review of the record and the evidence and argument presented during the hearings on the Motions, all three Motions are **DENIED**.

**DEFENDANT'S MOTIONS AND GOVERNMENT'S OPPOSITION**

Defendant is charged in a one-count indictment with knowingly possessing a firearm, a FN Model Five seveN, 5.7mm pistol, and ammunition in and affecting interstate and foreign commerce, knowing that he had previously been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1) [ECF No. 18].  For ease of reference, the Court refers to the subject firearm in this Order as a FN Five-Seven handgun.

The arguments in the three pending motions to suppress break down essentially into two parts: (1) Defendant's challenge to the evidence seized pursuant to a state search warrant of a residence and Nissan sedan on July 9, 2020 [ECF Nos. 63, 67]; and (2) Defendant's challenge to the search of his iPhone pursuant to a state search warrant issued on July 13, 2020 [ECF No. 33 as amended by ECF No. 41].  Although Defendant filed the motion to suppress the iPhone evidence first [ECF Nos. 33, 41], this Order begins chronologically with the arguments related to the search of the residence and car on July 9, 2020, followed by a discussion of the cell phone search that was authorized subsequently via search warrant on July 13, 2020.

### A. Defendant's Motions to Suppress Evidence Seized from Residence and Nissan Sedan [ECF Nos. 63, 67]

Defendant moves to suppress all of the evidence seized from a residence located at 3706 Avenue K, Fort Pierce, Florida, and from a Nissan Sedan that he was occupying as it was parked in the driveway of the same residence when he was arrested [ECF Nos. 63, 67].  The search of the residence and car was conducted on July 9, 2020, pursuant to a state search warrant signed and executed on July 9, 2020 by St. Lucie County Judge Schwab [ECF No. 90-3 (Application and Affidavit for Search Warrant); ECF No. 63-2 (Search Warrant)].   The affiant who prepared the affidavit is Detective Randy Walker of the St. Lucie Sheriff's Office.  The evidence Defendant seeks to suppress consists of the following:

- a loaded FN Five-Seven 5.7mm handgun found in a bag located in the trunk of the Nissan Sedan parked on the property [ECF No. 90-7], along with a receipt bearing Defendant's name in the same bag as the FN Five-Seven handgun;

- one box to a FN Five-Seven handgun, 5.7 caliber ammunition, 7.62mm ammunition, two loaded AK-47 style magazines, and numerous personal items belonging to Defendant found in the residence.

The loaded FN Five-Seven handgun is the subject of the Indictment in this case [ECF No. 18].

Defendant challenges the search warrant on two principal bases.

First, Defendant argues that the entire search warrant should be invalidated because the affidavit in support of the search warrant contained false statements and omissions [ECF No. 67 pp. 6–10]. According to Defendant, the affiant intentionally misstated that (1) Defendant was "in possession of the keys to the residence" when he was arrested on July 9, 2020, when in reality the passenger in the car that day, Defendant's music manager by the name of Shane Cole, had the keys in his pocket [ECF No. 67 pp. 12–13 (referring to ECF No. 67-1 p. 3)]; (2) certain items in the residence were "seen in plain sight" during a pre-warrant consent search of the residence with Luciana Knight [ECF No. 67 p. 14 (referring to ECF No. 67-1 p. 3)]; and (3) Defendant "was known to reside" at the 3706 Avenue K residence, when in reality the residence belongs to Defendant's mother, Luciana Knight, and Defendant stays there only occasionally as stated by Luciana Knight to law enforcement prior to the search [ECF No. 67]. Apart from intentional misstatements, Defendant argues that the affiant also omitted from the application certain material facts, including that Defendant's mother told law enforcement on scene that the firearms belonged to her, and that her son, the Defendant, hardly ever stays at the residence and had not been there for a week [ECF No. 67 pp. 14–15]. Had those facts been included in the affidavit, Defendant argues, the issuing Judge would not have found probable cause to support the warrant, warranting a *Franks* hearing [ECF No. 67 p. 15]. *See Franks v. Delaware*, 438 U.S. 154 (1978).

Second, specific to the search of the Nissan, Defendant advances the additional argument that the search warrant authorizes a search of the residence only, not the car parked in the driveway of the residence in which Defendant and the loaded FN Five-Seven handgun was located [ECF No. 63 pp. 6–9; ECF No. 81 pp. 4–6].

The government responds in opposition to both claims [ECF Nos. 69, 72]. The government refutes the existence of any intentional misrepresentations or omissions and says that no *Franks* hearing is warranted because probable cause would have supported the warrant regardless of any alleged misstatements or omissions. With respect to the scope of the warrant as it concerns the residence/car distinction, the government responds that the affidavit, although not precisely written, did establish probable cause to search the Nissan parked on the driveway of the residence and did authorize law enforcement to search the Nissan based on the language of the affidavit and the warrant itself [ECF Nos. 90-3, 90-4, 69]. At a minimum, the government continues, the exclusionary rule should not apply because officers acted in reasonable reliance on the search warrant issued by a detached and neutral magistrate, *see United States v. Leon*, 468 U.S. 897 (1984) [ECF No. 69 pp. 11–12]—a position refuted by Defendant [ECF No. 81 p. 7]. Finally, the government invokes the inevitable discovery exception to the exclusionary rule, arguing that the Nissan was a rental car owned by Enterprise, and that Enterprise personnel ultimately would have found the items and turned them over to law enforcement, or that law enforcement would have conducted an inventory search of the vehicle if Enterprise did not come to retrieve it [ECF No. 69 p. 13; *see* ECF No. 81 pp. 8–9 (defense response that no evidence supports inevitable discovery exception)]. The government did not meaningfully buttress the inevitable discovery exception at the hearing, and the Court finds an insufficient basis in the record to supports its application.

**B. Defendant's Motion to Suppress Evidence Obtained from Defendant's iPhone Searched Pursuant to State Search Warrant Dated July 13, 2020 [ECF No. 33; ECF No. 41 (amendment to ECF No. 33)]**

Defendant also seeks to suppress "any and all evidence, including the data and metadata, obtained in the search of his phone because it was obtained as the result of an illegal search" [ECF No. 33 p. 3; ECF No. 41 (amendment of ECF No. 31)].  The phone at issue is a black iPhone seized from Defendant on July 9, 2020, following his state arrest for illegal possession of a firearm [ECF No. 40-1 (Application and Affidavit for Search Warrant Signed on July 13, 2020); ECF No. 40-2 (Search Warrant)].[1]  Defendant acknowledges that his cell phone was searched pursuant to a state search warrant signed on July 13, 2020, four days after his state arrest.  But he argues that the affidavit in support of the search warrant lacked probable cause, because "it failed to set forth specific particularity and establish a nexus between the suspected criminal activity and the phone to be searched" [ECF No. 33 p. 4].  Defendant also raises three additional challenges to the search warrant of the iPhone.  He says that any probable cause in the affidavit was stale when it was issued on July 9, 2020, because it was based on an alleged aggravated assault with a firearm that took place in Osceola County, Florida, approximately six weeks earlier on May 31, 2020 [ECF No. 33 pp. 10–11].  He also characterizes the search warrant as an "overbroad" "fishing expedition" with no "limiting language," in violation of the Fourth Amendment and *Riley v. California*, 573 U.S. 373 (2014) [ECF No. 33 pp. 12–13].  And then he raises two challenges to the good-faith exception to the exclusionary rule in *United States v. Leon*, 468 U.S. 897 (1984): first that the warrant was "so facially deficient" in failing to particularize the probable cause [ECF No. 33 pp. 13–14], and second that the affiant included in the warrant certain information that the affiant purportedly "knew was false or would have known was false except for his reckless disregard for the truth" [ECF No. 41 (referring to alleged inaccuracies or omissions in search

---

[1] There is no dispute that the iPhone is Defendant's iPhone.

warrant application)].

The government asserts that the affidavit in support of the iPhone search warrant application contained probable cause to believe that the iPhone would contain evidence of Defendant's illegal firearm possession [ECF No. 40 p. 6]. Among other facts, the government notes that the affiant saw a photograph of Defendant, date stamped June 21, 2020, on Defendant's unrestricted Facebook page; the photograph depicted Defendant sitting in a car in possession of what appeared to be a FN Five-Seven handgun; the alleged victim of the May 31, 2020 firearm/assault incident in Osceola County reported that Defendant aimed a dark handgun at him and started to shoot; the victim identified Defendant by reference to Defendant's social media page; and Defendant was in possession of an iPhone when he was arrested for illegal firearm possession on July 9, 2020. On the basis of those facts, the government argues—especially the social media photograph reflecting Defendant's propensity to share images of his possession of a firearm—there was an objectively reasonable basis to believe that the cell phone seized from Defendant on July 9, 2020, would contain evidence of his illegal firearm possession [ECF No. 40 pp. 7–8]. The government also disputes Defendant's characterization of the warrant as overbroad, noting that the affidavit identified the types of data to be searched and limited the warrant to specific firearms offenses listed in the warrant application [ECF No. 40 p. 9]. As for staleness, the government responds that only 39 days elapsed from the date of the social media photograph (June 21, 2020) and the seizure of the phone (July 9, 2020) [ECF No. 40 p. 11]. And finally, the government urges that no such exception to the *Leon* good faith rule applies here, for two reasons: the affidavit contained specific reference to Defendant's publication of a social media image of himself engaged in unlawful possession of a gun that appeared to be the same gun found during his July 9, 2020 arrest [ECF No. 40 p. 13], and the information in the affidavit was based on facts known to the affiant at the time of the application, defeating any claim of bad faith

[ECF No. 44 pp. 2–4] .

## FACTUAL FINDINGS

The Court held an evidentiary hearing on January 3, 2022, on the instant motions.[2]  The Government called the following five law enforcement witnesses: (1) St. Lucie County Sheriff's Office Detective Christopher Jadin; (2) U.S. Deputy Marshal Andy Deacon; (3) Special Agent Seth Christy of the Bureau of Alcohol, Tobacco and Firearms and Explosives (ATF); (4) St. Lucie County Detective Randy Walker (Affiant of 3706 Avenue K Search Warrant [ECF No. 90-3]); and (5) Port St. Lucie Policer Officer and ATF Task force Officer Marc Stotler (Affiant for Cell Phone Search Warrant [ECF No. 40-1]).  Although the record reflects some differences in certain details as remembered by these witnesses, the Court has considered the credibility of each witness and the full record and finds their testimonies to be credible in accordance with the witnesses' good-faith recollections.[3]  Nor is the Court persuaded by Defendant's suggestion that one or more of the testifying officers engaged in intentional or reckless deception either during the hearing before this Court or in their conduct investigating the events in question.

The evidentiary hearing included a *Franks* hearing as requested by Defendant in his motion to suppress evidence seized from the 3706 K Avenue residence and the Nissan Sedan parked at the residence [ECF No. 67].  The Court proceeded with a *Franks* hearing on that motion over the Government's objection after determining that, although probable cause likely existed to support the warrant after removing any alleged misstatements and supplementing the affidavit with any

---

[2] The Court also heard legal argument from counsel on Defendant's iPhone search warrant motion on December 8, 2021.

[3] The Government admitted at the January 3, 2022 hearing Government Exhibits 1–6, 9, 16, and 20 [ECF No. 92-1].  Defendant admitted Defense Exhibits 1, 2, and 3 [ECF No. 88].  The suppression record also contains a thumb drive filed by Defendant in support of his Motion to Suppress Evidence [ECF Nos. 80, 82, 85].  The Court has reviewed the thumb drive, which contains portions of the police body camera footage of ATF Agent Seth Christy relevant to the events in question on July 9, 2020.

alleged omissions, Defendant had identified enough possible discrepancies in the affidavit to counsel in favor of a more fulsome evidentiary record [ECF No. 72]. Defendant did not request a *Franks* hearing in his written motion to suppress the cell phone search [ECF No. 33 as amended by ECF No. 41], and to the extent he did so implicitly or via oral argument, the Court finds no need on this record for an additional *Franks* hearing beyond the lengthy hearing already conducted.

Given the overlapping nature of the facts in this case, the following Factual Findings apply to all three motions to suppress, unless otherwise specified.

\*\*\*

**<u>May 31, 2020 Osceola County Incident Leads to Warrant for Defendant's Arrest</u>**

1. On May 31, 2020, there was an alleged aggravated assault with a firearm in Osceola County, Florida, involving Defendant. Defendant denies any culpability in that incident, and the State of Florida dismissed charges in connection with that incident on December 23, 2020 [ECF No. 33-1 pp. 16, 18]. For purposes of the suppression motions in this case, however, Defendant does not dispute that the May 31, 2020, incident triggered law enforcement's arrest of Defendant in what ultimately became this federal case. Nor does Defendant, for purposes of these motions, dispute the accuracy of the references to the May 31, 2020, information as contained in the subject warrants [ECF No. 33 p. 1]. The May 31, 2020 incident is therefore described herein, not as a finding of Defendant's criminal liability for that incident, but solely as it pertains to the presence of probable cause underlying the search warrants now challenged by Defendant.

2. As alleged, on May 31, 2020, in Osceola County, Defendant became involved in an altercation with an unnamed victim [ECF No. 40-1]. Detective Covas of the Osceola County Sheriff's Office investigated the incident and learned the following, as detailed in an arrest affidavit [ECF No. 40-1 p. 3]. Defendant started a fight with the victim. During the fight, Defendant

broke away from the fight, went to his car, produced a dark colored handgun, aimed the firearm at the victim, and began to shoot [ECF No. 40-1 p. 3].  The victim ran from the scene, after which deputies recovered various shell cases indicating the presence of a second shooter (.40 caliber and .380 caliber).

3.   The alleged victim of the May 31, 2020 incident positively identified Defendant as the shooter; stated that Defendant goes by his "stage name" "Polo Bryant"; and showed deputies on scene "Polo Bryant's" Facebook Page, again identifying "Polo Bryant" as Defendant [ECF No. 40-1 p. 3].  Detective Covas reported this information to Detective Stotler of the Port St. Lucie Police Department [ECF No. 40-1 p. 3].

4.   Detective Stotler continued his investigation and saw a photograph of Defendant, also known as "Polo Bryant," on Defendant's Facebook Page "Uptown Polo."  The photograph, date-stamped June 21, 2020, depicted Defendant sitting in a sedan with the grip, rear sight post and part of the slide of a firearm that appeared to be an FN Five-Seven handgun [ECF No. 40-1; *see* ECF No. 90-9 (Government Exhibit 20 contained in a flash drive)[4]].

5.   The government does not dispute that the "date-stamped" date of June 21, 2020 on Defendant's social media page may not be the date that the photograph was physically taken, but there is no dispute that the image reflects a posting date of June 21, 2020 on Defendant's social media page [ECF No. 33 p. 12].

6.   On July 8, 2020, Detective Covas obtained a warrant for the arrest of Defendant for violation of the following four Florida offenses, all in connection with the May 31, 2020 Osceola County incident: aggravated assault with a deadly weapon (Count 1), use of a firearm during a felony

---

[4] This photograph was displayed at the hearing and appeared to derive from Defendant's Instagram page, not Defendant's Facebook page.  The Court does not find that Facebook/Instagram differential to be legally significant to resolution of the instant Motions, nor did Defendant present any argument establishing such legal significance at the hearing.  The Court refers to the photograph as Defendant's "social media" photograph date stamped June 21, 2020.

(Count 2), discharging a firearm in public (Count 3), and battery (Count 4) [ECF No. 33-1 p. 6].

7.  The felony arrest warrant, dated July 8, 2020, is signed by a state court judge and lists personal identifying information for Defendant, including an address of 3706 Avenue K, Fort Pierce, Florida [ECF No. 33-1 p. 6].

**Law Enforcement Executes an Arrest Warrant of Defendant on July 9, 2020 at 3706 Avenue K and Then Conducts a Search of the Home Pursuant to Defendant's Mother's Consent as Recorded on Body Camera**

8.  Following the issuance of the July 8, 2020 Osceola County felony arrest warrant, law enforcement assembled a team to execute the arrest of Defendant.

9.  Approximately eight law enforcement personnel were called to assist in the execution of the arrest warrant, including Detective Christopher Jadin, Detective Marc Stotler, ATF Special Agent Seth Christy,[5] and U.S. Deputy Marshal Andy Deacon.  Arrest teams can fluctuate in number from approximately four to twenty officers, depending on the severity of the crime, but firearms offenses as involved here necessitate having more people as part of a team to effectuate the warrant.

10. U.S. Deputy Marshal Andy Deacon was the tactical commander of the arrest operation. Deputy Marshal Deacon has worked for the Marshals Service for thirteen years, serves currently as the "federal warrants coordinator" in Fort Pierce, Florida, and previously served in the U.S. Army for approximately nine years.  Deputy Marshal executes over 100 search warrants annually.

11. Deputy Marshal Deacon testified credibly that 3706 Avenue K was a known address for Defendant, and that he had encountered Defendant at that address previously.  Deputy Deacon

---

[5] ATF Agent Christy's body camera footage admitted by Defendant [ECF No. 85] shows other law enforcement officers on scene at 3706 Avenue K on July 9, 2020.

acknowledged the undisputed fact that Defendant's mother (Knight) lives there, and he admitted on cross-examination that Defendant's Florida's driver's license reflects another address different from the 3706 Avenue K address [ECF No. 88-3 (Defendant's driver's license listing other address in Fort Pierce, Florida)].

12. Detective Jadin also testified credibly that he had become familiar with Defendant prior to July 9, 2020, and that he knew Defendant to be associated with the 3706 Avenue K address in Fort Pierce, Florida.  Detective Jadin has been a law enforcement officer for twenty-four years and has spent the past five years investigating gangs in St. Lucie County.  Detective Jadin's primary role on scene was to provide physical security for the police investigators on scene.

13. ATF Agent Christy testified credibly that (a) as far as law enforcement was concerned, 3706 Avenue K was a known address for Defendant; (b) law enforcement had prior contacts with Defendant at that address; (c) Defendant's mother, Luciana Knight, stated that Defendant lived at the 3706 Avenue K address during a field interview approximately 9 months prior to July 2020; and (d) ATF Agent Christy personally had spoken to Osceola County Detective Covas prior to July 9, 2020 in reference to the May 31, 2020 incident.  ATF Christy acknowledged, however, that he had not come into independent contact with Defendant prior to July 9, 2020.

14. The arrest team arrived simultaneously at 3706 Avenue K to execute the arrest warrant.  Prior to approaching the house, members of the arrest team conducted mobile surveillance of the house by driving around the home.  During that surveillance, officers saw a male matching Defendant's description drive onto the driveway of the residence in a Nissan sedan with one other occupant inside the car (later determined to be Shane Cole, Defendant's music manager). Officers could see Defendant coming in and out of the Nissan parked on the property.

15. The Nissan is a rental car owned by Enterprise.

16. Upon arrival to the 3706 Avenue K address, Detective Jadin drove through a side road onto

the property, parked close to the Nissan being occupied by Defendant who was seated in the driver's seat, and ordered Defendant onto the ground.  Detective Jadin was the first to come into contact with Defendant that day, handcuffed Defendant, and conducted a safety pat down of Defendant with the help of other officers.  Defendant complied and was placed under arrest. No weapons were found on Defendant's person.  The passenger side door of the Nissan was open, and Shane Cole was sitting inside.  Shane Cole is Defendant's music manager.  No one else was in the Nissan.  Defendant was in the driver's seat with Cole as the passenger.

17. The 3706 Avenue K residence has a front door and a side door; the side door is on the east side of the house and was partially ajar that day, and the Nissan was parked towards the northeast corner near the partially ajar side door.

18. Luciana Knight is Defendant's mother and resides at the 3706 K Avenue address.  Detective Jadin previously had met Knight on two prior occasions when Detective Jadin was taking Defendant into custody on other charges.  Deputy Marshal Deacon also knew Knight from previous occasions in which he attempted to serve arrest warrants on that residence.

19. Knight arrived on scene shortly after Defendant's arrest and was concerned that her minor relative might be in the house, so officers conducted a protective sweep of the residence to see if anyone was inside, finding no one.  For safety reasons, Knight did not go into the house during the protective sweep.

20. Marshal Deacon and other officers then spoke to Knight, who verbally consented to a search of her home as recorded on the body camera footage of ATF Agent Seth Christy.  Defendant does not challenge Knight's consent.  A transcript of the body camera footage was submitted as Government's Exhibit 6, and the Court finds that it fairly and accurately reflects the audio content of the admitted body camera footage [ECF No. 90-6].

21. For a few minutes, the officers stood outside of the front door of the residence while Knight

talked on her cell phone with an unidentified individual.  Knight can be heard on the cell phone expressing frustration and uncertainty about what was transpiring at her residence, stating, for example, that "they," referring to Defendant and Cole, had "literally just" come to the store to get from her the keys to the 3706 Avenue K property as well as one of her three cell phones; that "one of them" had the keys; that Defendant had been out of town for "over a week now" and had just come back from a video shoot in Fort Lauderdale; that she had told Defendant not to come back to her home; and that she was tired of all this "bullshit."  Knight told officers during this conversation outside the home that she legally owns firearms that she has in the house.  She admitted that she had a 9mm gun Glock on her bed but denied owning a .40 or a .380.  She referenced there being three to four guns in the home that she owns, including a Draco and a 9mm Glock.  She made no mention of a FN Five-Seven handgun.

22. At that point, the officers and Knight remained outside of the house waiting to get the keys to enter the residence.  Knight repeated that "one of them" had the keys because "they" (referring to Defendant and Cole) had just come to get them from her at the "store."  Officers can be seen in the video walking back to the Nissan sedan; Cole is standing by the Nissan; Defendant does not appear at the back of the house with Cole at that point because he had been moved to a police vehicle elsewhere on the property; and, although the video footage is not entirely clear, it appears the officers retrieve the keys from Cole and walk back to the residence to commence the search of the residence.

23. Detective Jadin testified that he remembers the keys coming from Defendant's pockets, although he did not personally retrieve any keys in this case or process evidence.  Based on the body camera footage and the full record, the Court finds Detective Jadin's recollection on this particular point to be honestly mistaken; Cole had physical possession of the keys at the moment officers retrieved the keys from Cole prior to searching the home with Knight.

24. After obtaining the keys to the residence, Marshal Deacon, Detective Stotler, and Agent Christy entered the home with Knight.  Agent Christy asked Knight which room was Defendant's, to which Knight responded that he was "barely" there, but that he "stays there sometimes" and last slept at the residence "over a week ago maybe" but then left to Fort Lauderdale to do a video shoot for his music business.  She also stated that "he" got her keys that day and her phone.  Agent Christy asked Knight which room Defendant uses when he does stay at the residence, and Knight pointed officers to a room with a bed inside that she described as a "storage room" containing a substantial amount of miscellaneous storage items (drinks, personal products, Knight's medicines/vitamins).  Officers proceeded to search that bedroom looking for firearms but did not find any firearms or firearm paraphernalia in that bedroom/storage room.

25. Continuing with the body camera footage, officers then went into Knight's bedroom and located the 9mm Glock in plain view on her bed as reported by Knight earlier.  While this was happening, Detective Stotler entered a third bedroom with an open closet door and asked Knight if there was anything in that room; Knight said no but that she had a safe in that room; and then Detective Stotler can be heard on the body camera footage referencing an "FNH box" and saying that he found a Crown royal bag in the closet containing "chopper" magazines. Agent Christy also went into that room, at which point Detective Stotler showed Agent Christy the FNH box in the open closet.  Agent Christy asked Detective Stotler to dump out the contents of the Crown Royal bag onto a bed in that room, which he did, revealing two loaded magazines in the bag.

26. Detective Stotler saw the FNH gun box in the closet because the closet doors were open when he walked into the bedroom, although Detective Stotler confirmed that he did not open the FNH box at that time to see if it actually contained a firearm.  (Following execution of the

14

search warrant, no such FN Five-Seven handgun was found in the FN box in the residence, but a FN Five-Seven handgun was found in the trunk of the Nissan parked on the residence and occupied by Defendant that day).

27. Deputy Marshal Deacon testified that he recalled seeing a firearm box in a closet that day, although he remembered only generalities from the search of the home.

28. Detective Christy, in his law enforcement capacity, has experience with FN Five-Seven handguns, which he explains can penetrate bullet proof vests and contain a serial number in a unique position near the muzzle of the gun.

29. After Detective Stotler saw the FNH box and emptied the Crown Royal bag with the loaded magazines, officers asked Knight again about the firearms she owns.  Knight said that she had a Draco and a 9mm Glock, plus "a little smaller one," some 9mm magazines in a Crown Royal bag, and perhaps some .45 caliber magazines in the residence.  ATF Agent Christy then told Knight that they had found additional "stuff over there that you didn't mention" (referring to the bedroom in which Detective Stotler saw the FNH box in the open closet and the Crown Royal bag)—so they were going to do a search warrant on the house.  Knight responded that she did not mind, but that her "brother stays here" "off and on too" [ECF No. 90-6 p. 23].  ATF Agent Christy then asked Knight if she had ever heard of an "FNH," to which Knight responded that she had previously bought a FNH .40 caliber firearm "off the streets" that she did not like it so "that's been gone" [ECF No. 90-6 p. 26].

30. After that discussion, Knight and all of the officers left the residence pending officers' securing a search warrant.  The body camera footage ends at that point.

**Detective Walker Prepares Search Warrant on Scene**

31. Detective Walker of the Special Investigations Division ("SID") of the St. Lucie County Sheriff's Office drafted and served as the affiant for the affidavit pursuant to which law

enforcement searched the 3706 Avenue K residence and the Nissan sedan parked in the backyard [ECF No. 90-3].

32. Detective Walker was not on the scene during the arrest of Defendant and consent search of the residence.

33. Within approximately ten minutes of Detective Walker's arrival, a sergeant determined that Detective Walker would be the affiant for the affidavit. There were supervisors present from the St. Lucie County Sheriff's Office, including Lieutenant Jones and Sergeant Pierson.

34. As of July 2020, Detective Walker had been a Sheriff's Deputy for approximately four years but had joined SID only recently. He had prepared only a handful of warrants and was not an experienced drafter of warrants. The Sheriff's Office encourages hands-on experience drafting warrants and does not offer training specific to drafting search warrants.

35. Detective Walker previously had served in the military for approximately four years. He has held positions in various divisions within the St. Lucie County Sheriff's Office, including in road patrol and school resources. He has a degree in criminal justice.

36. Detective Walker typed the affidavit in his police vehicle after speaking to multiple officers on scene, including Detective Jadin, ATF Agent Christy, and Deputy Marshal Deacon. Detective Walker asked questions of the officers as he was typing the affidavit, and officers briefed Detective Walker on what happened.

37. Detective Walker also conducted an independent survey of the scene when he arrived and spoke to his supervisor about what had transpired on scene.

38. In general, Detective Walker received a lot of information from officers on scene, asked clarifying questions, and prepared the affidavit based on the information he received from other officers on scene—ultimately including what he believed was necessary to establish probable cause.

39. Had he been told that the keys to the residence were found on someone else's person (i.e., Shane Cole), he would have included that information in the affidavit.

40. Detective Walker does not have an independent memory of what was relayed to him on scene other than what he wrote in the search warrant application.

41. When Detective Walker was drafting the probable cause section of the affidavit [ECF No. 90-3], he does not subjectively recall specifically intending to establish probable cause to search the Nissan parked on the residence.  The text of the affidavit is discussed in more detail in the Conclusions of Law section below.

42. It is not clear whether the officers who briefed Detective Walker on scene specifically proofread the affidavit or asked Detective Walker to read it back to them.

**Following Issuance of Search Warrant, Law Enforcement Searches the 3706 Avenue K Residence and the Nissan Sedan Pursuant to Search Warrant**

43. On July 9, 2020, St. Lucie County Judge Schwab signed a search warrant based on the affidavit provided by Detective Walker [ECF No. 90-4].

44. The search warrant finds probable cause to believe that evidence of firearms, ammunition, and indicia of ownership of the premises would likely be found "in/about" the residence, described also as "the premises" [ECF No. 90-4].

45. The search warrant then authorizes law enforcement "to enter and search the said residence, curtilage, outbuildings, and conveyances, and persons located on said curtilage for items and contraband as listed above," referring to the firearms, ammunition, and indicia of ownership [ECF No. 90-4 p. 2].

46. That same day, officers conducted a search of the residence and the Nissan parked in the backyard of the residence pursuant to the signed search warrant.

47. Officers seized a loaded FN Five-Seven 5.7 mm handgun inside a bag in the trunk of the Nissan Sedan Defendant had occupied that same day (July 9, 2020) prior to his arrest, along with a

receipt with Defendant's name on it in the same bag as the FN Five-Seven handgun [ECF No. 90-7 (photograph of seized FN Five-Seven handgun)].

48. Inside an open closet in one of the bedrooms inside the residence, officers seized a box to a FN Five-Seven Handgun; 5.7 caliber ammunition; two loaded AK-47-style magazines; 7.62 mm ammunition; and various items belonging to the Defendant, including men's clothing and recording equipment consistent with Defendant's work as a rap artist.[6]  There were no other gun boxes in the closet.

49. Because the Nissan Sedan was a rental car owned by Enterprise, Detective Stotler spoke with an Enterprise representative while he was on scene.  The Enterprise representative advised that he/she would send a tow truck to retrieve the car, but law enforcement asked Enterprise to stand by pending execution of the search warrant. Detective Stotler later reached out to Enterprise again in the afternoon, but he could not remember making any ultimate contact with Enterprise about a resolution for pick-up of the car.  The details of Enterprise's involvement in retrieving the car are not developed in the record, and no one from Enterprise testified at the evidentiary hearing.

## On July 13, 2020, Law Enforcement Obtains a Search Warrant to Search Defendant's Black iPhone Found in His Possession During Arrest on July 9, 2020

50. On July 13, 2020, four days following Defendant's arrest, St. Lucie County Judge Alonzo signed a search warrant to search Defendant's Black iPhone seized from Defendant's person on July 9, 2020 [ECF No. 40-2].

51. There is no dispute that the iPhone belongs to Defendant or that it was located on his person during his arrest on July 9, 2020.

---

[6] During the consent search of the residence, prior to seeking the arrest warrant, ATF Agent Christy saw men's clothing in the house and recording equipment consistent with Defendant's occupation as a rap artist.

52. The search warrant is based on the affidavit of Detective Stotler, who served as the affiant for the cell phone search warrant [ECF No. 40-1].

53. The affidavit states that there is probable cause to believe that the iPhone contains evidence linked to five Florida criminal offenses: Fla. Stat. § 790.23 (felon in possession of a firearm/ammunition), Fla. Stat. § 784.02 (aggravated assault with a deadly weapon), Fla. Stat. § 790.07 (use of firearm during felony), Fla. Stat. § 790.15 discharging a firearm in public), and Fla. Stat. 784.03 (battery) [ECF No. 40-1 pp. 1, 3].

54. The probable cause section of the affidavit explains the background of the investigation starting in June 2020 when Detective Stotler saw a photograph, date stamped June 21, 2020, of Defendant on Defendant's public Facebook page sitting in a sedan with the grip, rear sight post and part of the slide of what appeared to be a FN Five-Seven handgun.  The affidavit then describes, among other matters, (a) the May 31, 2020 incident in Osceola County during which Defendant allegedly produced a dark handgun from his car, aimed it at a victim during a fight, and fired; (b) the arrest of Defendant on July 9, 2020 after being located in the Nissan Sedan with Shane Cole; and (c) the seizure of a FN Five-Seven handgun in a bag in the trunk of the Nissan with a receipt with Defendant's name on it in the same bag [ECF No. 40-1 pp. 3–5].

55. The affidavit then concludes as follows: "[Y]our affiant is seeking evidence located inside of Ronell Bryant's Apple iPhone that shows a further connection to the FN Five-Seven Handgun, further firearms, ammunition, the above listed crimes in Osceola County and/or the historical location data placing Ronell Bryant and Shane Cole in Osceola County during the above listed incident" [ECF No. 40-1 p. 5].

56. Finally, the affidavit specifies the "digital data" sought, listing "phone numbers," "call logs," "pictures/videos text messages," "way points, track logs, points of interest, time and dates stamps linked to locations of the unit, Wi-Fi hotspots, GPS locations, deleted information, blue

tooth activity and owner/unit information" [ECF No. 40-1 p. 5].

57. Law enforcement ultimately searched Defendant's iPhone pursuant to the signed search warrant and found evidence the government wishes to introduce at trial. Among other items, this evidence consists of various photos of Defendant possessing firearms, including photographs sent in close or fairly close temporal proximity to Defendant's arrest in this case depicting Defendant possessing what appears to be the same FN Five-Seven handgun found in the trunk of the Nissan [ECF No. 62 pp. 3, 6 (describing contents of materials found on Defendant's phone); ECF No. 33 p. 3].

## GENERAL LEGAL STANDARDS

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The touchstone of the Fourth Amendment is "reasonableness,"[7] and "reasonableness generally requires the obtaining of a judicial warrant." *Riley v. California*, 573 U.S. 373, 382 (2014).

Although the text of the Fourth Amendment does not itself command the exclusion of evidence, the Supreme Court, as a prudential matter, created the exclusionary rule to yield meaningful deterrence of future Fourth Amendment violations. *See Davis v. United States*, 564 U.S. 229, 236–37 (2011); *United States v. Leon*, 468 U.S. 897, 906 (1984). For the "harsh sanction" of exclusion to be appropriate, therefore, the "deterrence benefits of suppression must

---

[7] *Heien v. North Carolina*, 574 U.S. 54, 60–61 (2014) ("To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them 'fair leeway for enforcing the law in the community's protection.'" (quoting *Brinegar v. United States*, 338 U.S. 160 (1949)).

outweigh its heavy costs"—i.e., when law enforcement exhibits "deliberate," "reckless," or "grossly negligent" disregard for Fourth Amendment rights. *Davis*, 564 U.S. at 237–38, 241; *see also Leon*, 468 U.S. at 908.

The instant motions [ECF Nos. 33, 41, 63, 67] challenge the validity of two search warrants—one pursuant to which law enforcement searched a residence located at 3706 Avenue K and a Nissan Sedan parked in the driveway of that residence on July 9, 2020 [ECF Nos. 90-3, 90-4], and a second pursuant to which law enforcement searched Defendant's black iPhone found on Defendant's person when he was arrested as he was parked in the driveway of that residence [ECF Nos. 40-1, 40-2].

The Supreme Court has expressed "a strong preference" for searches conducted pursuant to a warrant and has directed courts to accord "great deference" to a magistrate's determination of probable cause. *Leon*, 468 U.S. at 897 (internal quotation marks omitted); *id.* at 922 ("[A] warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." (internal quotation marks omitted). To this end, affidavits supporting warrants are presumptively valid, *Franks v. Delaware*, 438 U.S. 154, 171 (1978), and courts should not invalidate warrants by interpreting affidavits in a "hypertechnical, rather than [in] a commonsense, manner," *Illinois v. Gates*, 462 U.S. 213, 236, (1983) (internal quotation marks omitted). "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238. "And the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *Id.* at 238–39 (internal quotation marks, ellipses, and brackets omitted).

As enunciated in *Franks*, however, deference to a magistrate's determination of probable

cause "does not preclude inquiry into the knowing or reckless falsity of the affidavit on which that determination was based." *Leon*, 468 U.S. at 897. This derives from the root assumption that, when the Fourth Amendment requires probable cause for the issuance of a warrant, the showing of probable cause will be "truthful." *Franks*, 438 U.S. at 164–65. "Truthful" in this context does not mean, however, "that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily." *Franks*, 438 U.S. at 165. "But surely it is to be 'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant as true." *Id*.

Accordingly, a defendant may challenge the veracity of an affidavit under *Franks* if he makes a "substantial preliminary showing" that (1) the affiant deliberately or recklessly included false statements, or failed to include material information, in the affidavit; and (2) the challenged statement or omission was essential to the finding of probable cause. *Franks*, 438 U.S. at 155–56. If the defendant makes such a substantial showing, he is entitled to an evidentiary hearing on the issue. *Id*. at 155. And, if after a *Franks* hearing, the defendant establishes "perjury or reckless disregard" by a preponderance of the evidence and shows that the inclusion of the omitted evidence would defeat the probable cause in the affidavit, "the search warrant must be voided and the fruits of the search excluded." *Id*. at 156; *see United States v. Novaton*, 271 F.3d 968, 986 (11th Cir. 2001).

Apart from requiring probable cause, the warrant clause of the Fourth Amendment also requires that warrants must particularly describe "the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The particularity requirement prevents general searches and assures the individual whose property is searched of the "lawful authority of the executing officer, his need to search, and the limits of his power to search." *Groh v. Ramirez*, 540

U.S. 551, 561 (2004) (internal quotation marks omitted).  "A description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized." *United States v. Wuagneux*, 683 F.2d 1343, 1348 (11th Cir. 1982); *see also Steele v. United States*, 267 U.S. 498, 503 (1925) (observing that the particularity-of-description requirement is satisfied where "the description is such that the officer with a search warrant can with reasonable effort ascertain and identify the place intended").

Finally, in *United States v. Leon*, 468 U.S. 897 (1984), the Supreme Court enunciated the so-called "good faith" exception for searches conducted pursuant to warrants.  *Id.* at 924.  Under that rule, courts should not render inadmissible evidence obtained by police officers acting in objectively reasonable reliance upon a search warrant that ultimately is found to be unsupported by probable cause.  *Id.* at 926 ("In the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause."); *id.* at 918 ("[S]uppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule.").

The *Leon* good faith exception applies except in the following four circumstances:

(1) where the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing magistrate wholly abandoned his judicial role in the manner condemned in *Lo–Ji Sales, Inc. v. New York*, 442 U.S. 319 (1979); (3) where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where, depending upon the circumstances of the particular case, a warrant is so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid.

*United States v. Martin*, 297 F.3d 1308, 1313 (11th Cir. 2002) (internal quotation marks omitted).

## CONCLUSIONS OF LAW

Following a complete review of the record, the evidence presented during the evidentiary/*Franks* hearing, the subject warrants and affidavits, the credibility and factual findings set forth above, and the applicable law, the Court **DENIES** Defendant's Motions to Suppress.

### A. Defendant's Motions to Suppress Evidence Seized from Residence and Nissan Sedan [ECF Nos. 63, 67]

Defendant moves to suppress the evidence seized from a residence located at 3706 Avenue K, Fort Pierce, Florida, and from a Nissan Sedan that he was occupying as it was parked in the driveway of the same residence when he was arrested [ECF Nos. 63, 67].  As noted, this evidence consists of a loaded FN Five-Seven 5.7mm handgun found in a bag located in the trunk of the Nissan parked on the property [ECF No. 90-7]; a receipt bearing Defendant's name in the same bag as the FN Five-Seven handgun; and a box to a FN Five-Seven handgun found in an open closet inside the residence along with 5.7 caliber ammunition, 7.62mm ammunition, two loaded AK-47 style magazines, and numerous personal items belonging to Defendant.

Defendant raises two overall challenges to the search warrant—first that it should be invalidated pursuant to *Franks* because it rests on alleged material misstatements and omissions, and second, that it authorized a search of the residence only, not the Nissan parked in the backyard of the residence in which the firearm was located.  The Court addresses these arguments in turn, starting with the *Franks*-related claim.

#### 1. The record does not support an inference of deliberate or reckless falsehoods.

According to Defendant, Detective Walker intentionally misstated that (1) Defendant was "in possession of the keys to the residence" when he was arrested on July 9, 2020, when in reality the passenger in the car that day, Defendant's music manager by the name of Shane Cole, had the keys in his pocket; (2) certain items in the residence were "seen in plain sight" during a pre-warrant

consent search of the residence with Luciana Knight; and (3)  Defendant "was known to reside" at the 3706 Avenue K residence, when in reality the residence belongs to Defendant's mother, Luciana Knight, and Defendant stays there only occasionally as stated by Luciana Knight to law enforcement prior to the search [ECF No. 67].  None of these items triggers a *Franks* violation.

*First*, the affidavit states: "Detective Jadin informed your affiant that when he made contact with Bryant, he was in possession of the keys to the residence" [ECF No. 90-3 p. 3].  As the Court's factual findings indicate, it was Defendant's manager Shane Cole, the co-occupant of the Nissan, who had the keys in his physical possession at the moment Defendant was arrested on scene—not Defendant.  However, contrary to Defendant's assertion that Detective Walker "intentionally misled" the reviewing magistrate [ECF No. 67 p. 6; *see* ECF No. 67 p. 13], the record and the credibility findings do not reveal any deliberate or reckless conduct on the part of Detective Walker in making that assertion.  Detective Walker included in the affidavit what was relayed to him on that point by Detective Jadin.  Detective Walker spoke with multiple officers on scene, asked clarifying questions as he drafted the affidavit, reasonably prepared the affidavit based on the information provided to him, and had no basis to disbelieve or question his statement in the affidavit that Defendant had possession of the keys.  Although it turns out that Detective Jadin ultimately was mistaken on who—Defendant or Cole—was holding the keys at the moment of arrest, that inaccuracy was the product of an unintentional error that reasonably can be explained on the basis of the full record, including, most significantly, Defendant's mother's repeated statements that both Defendant and Cole together had retrieved the keys from her just before going to the residence.[8]  Indeed, there is no dispute that Defendant and Cole—together—got the keys

---

[8]  [ECF No. 90-6 p. 6 ("We literally just left the store.  They have my keys.  One of them have my keys."); ECF No. 90-6 p. 7 ("They just got my keys and my phone."); ECF No. 90-6 p. 8 ("They got my phone, and they have my keys."); ECF No. 90-6 p. 8 (Q. Who has your keys? A. One of them.  Literally, they just came to the store with me.  I gave them my keys and my phone."); ECF No. 90-6 p. 10 ("[Y]ou got my phone, who whoever got my phone got my keys.");

from Knight "literally" moments before the arrest.  Nor is there a dispute that Defendant and Cole

were found riding together in the Nissan vehicle parked outside of the residence.  The Court thus

finds no *Franks* violation on this issue.  *See* 438 U.S. at 171 (noting that, although statements in a

warrant affidavit must be "truthful," "truthful" in this context does not mean that "every fact recited

in the warrant affidavit is necessarily correct" provided the information put forth, as here, is

"appropriately accepted by the affiant as true").

In any event, even if the affidavit had specified that Cole, Defendant's co-occupant, was

the one physically holding the keys moments after going with Defendant to pick up the keys from

Defendant's mother, the affidavit still contained probable cause to believe that the residence and

the car on the curtilage of the residence would contain evidence of *Defendant*'s illegal firearm

possession.  Defendant was located in a car in the backyard of the property with Cole after

collectively retrieving the keys from Defendant's mother; the side door of the residence was ajar

and unsecure; and Knight informed agents that Defendant "had they keys to the vehicle and

residence" [ECF No. 90-3 p. 3].  The who-was-holding-the-keys point does not materially alter the

finding of probable cause on this record.

***Second***, Defendant challenges the statement in the affidavit that states: "Deputy U.S.

Marshal A. Deacon informed your affiant that while in the residence, other items were seen in

plain sight.  Some of the items discovered were a FN gun box, two magazines containing what

appeared to be 7.62x39mm ammunition" [ECF No. 90-3 p. 3].   The Court again finds no *Franks*

issue here.  Importantly, it is clear from the record that the FN gun box was found in "plain sight"

in an open closet during a search consented to by Knight.  Defendant does not challenge the validity

of Knight's consent in this case.  Although the warrant should have more precisely delineated the

---

ECF No. 90-6 p. 18 ("Nobody got a key to my house but me . . . .  That's why like I said, they just
left from the store with me."); ECF No. 90-6 p. 28 ("Well, he [referring to her son Defendant] had
my keys in his possession too . . . .")].

fact that the two magazines were found in a cloth bag in the closet as opposed to in "plain sight," there is no evidence that Detective Walker acted with an intent to mislead or with reckless disregard for the truth—either in general or in conveying the pertinent results of the search to which Knight consented.  Warrant affidavits are "normally drafted by nonlawyers in the midst and haste of a criminal investigation," *United States v. Ventresca*, 380 U.S. 102, 108 (1965), and "[m]ere imprecision does not, by itself, show falsity," *United States v. Moody*, 931 F.3d 366, 372 (4th Cir. 2019).

In addition, even if the affidavit had specified that only the FN box (not the magazines) were found in plain sight, that distinction would not materially affect the probable cause determination.  The affidavit still revealed that law enforcement, pursuant to a consent search of Defendant's mother's home, found a FN gun box in an open closet in a house where Defendant "stay[s]"; Defendant was located in a car at that address; Defendant was seen in a photograph possessing what appeared to be a FN Five-Seven handgun; Defendant was arrested pursuant to an active arrest warrant for aggravated assault with a deadly weapon; and Defendant's mother advised that Defendant "had they keys to the vehicle and residence" [ECF No. 90-3 p. 3].  This is sufficient under the circumstances to establish a fair probability that contraband or evidence of Defendant's illegal firearm possession would be found in the residence and in conveyances on the curtilage of the residence.  Probable cause "deal[s] with probabilities," *Brinegar v. United States*, 338 U.S. 160, 175 (1949), and although the affidavit is incorrect with respect to the "plain sight" nature of the magazines specifically, the issuing judge nonetheless had a requisite basis to determine the existence of probable cause, and the Court finds no intentional or reckless conduct on the part of Detective Walker in drafting the affidavit.  *See Maughon v. Bibb County*, 160 F.3d 658, 660 (11th Cir. 1998) (observing that negligent or innocent mistakes in a warrant application do not violate a defendant's Fourth Amendment rights).

***Third***, Defendant argues that the affidavit "intentionally misleads the reviewing magistrate about Mr. Bryant staying in the residence" [ECF No. 67 p. 9].  Defendant points specifically to the statement in the affidavit that reads: "Knight informed ATF Special Agent Christy that the residence is hers but her son, Ronell Bryant does stay there and that Bryant had they keys to the vehicle and residence" [ECF No. 90-3 p. 3].  According to Defendant, this statement materially misleads the reader into believing that Bryant lives in the residence, and Detective Walker should had added to the affidavit Knight's statement to law enforcement that Defendant "hardly ever stays" there and had not been there for more than a week [ECF No. 67 p. 9].

The Court is not persuaded that a *Franks* violation exists on the issue of Defendant staying at the residence.  Based on a complete review of the record, including the credibility testimony of the law enforcement witnesses who testified at the hearing, the statement that Defendant "does stay there" is not false.  Nor, on this record, is the statement that Knight informed ATF Christy that Defendant had the keys to the residence, which she told law enforcement several times in explaining that Defendant and Cole had obtained the keys from her to the residence right before the arrest.  More substantively, the affidavit openly acknowledges that the residence is Knight's residence, and then it accurately states that Defendant stays there, which is consistent with his undisputed "stay" approximately one week before [ECF No. 90-3 p. 3].   Also relevant is the consistent and credible testimony of Deputy Marshal Deacon, Detective Jadin, and Detective Christy, all of whom testified credibly that 3706 Avenue K was a known address for Defendant, even if his driver's license listed another address, and that law enforcement had prior contacts with Defendant at that address.[9]  It is true that the affidavit does not add the further detail, per Knight, that Defendant "hardly ever stays there"—a point that is not undisputed—but the *Franks* rule does

---

[9] The arrest warrant that triggered this federal case, the substance of which Defendant does not challenge, lists the 3706 Avenue K address as Defendant's address [ECF No. 33-1].

not require an affiant to include every possible detail in an affidavit to support probable cause in accord with the Fourth Amendment.  And more fundamentally, viewing the context of the affidavit in light of the full record, the Court finds no evidence suggesting an intent to deceive the magistrate into believing that Defendant had a materially stronger connection to the residence than what is borne out by the record.

> **2.  The various additional items that Defendant says were wrongfully omitted from the warrant do not raise an inference of deliberate or reckless falsehoods and do not disturb the finding of probable cause to support the warrant.**

Apart from intentional misstatements, Defendant argues that the affiant also omitted from the application various facts, including that Knight told law enforcement on scene that the firearms belonged to her; that Knight is retired military and lawfully can possess firearms; and that Knight told law enforcement that Defendant stayed in a room other than the room in which the FN gun box and loaded magazines were found [ECF No. 67].  The record does not support Defendant's claims that such omissions were either deliberate or reckless, and in any event, adding that information back into the affidavit would not have altered the probable cause determination.

With respect to Knight's status as a lawful gun owner of guns in the house, the affidavit clearly states that Knight informed Agent Christy that "she owns several guns and they're in the house" [ECF No. 90-3 p. 3].  The affidavit also specifically mentions that Defendant is a convicted felon [ECF No. 90-3 p. 3].  The fact that the affidavit did not further describe Knight's status as former military or her status as a lawful gun owner does not make a material difference or evince an intent to mislead the magistrate.  The Supreme Court has emphasized the great deference to be accorded to warrants and made clear that "courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense manner."  *United States v. Ventresca*, 380 U.S. 102, 109 (1965).

As for Defendant's assertion that the affidavit should have included Knight's claim that

Defendant stays in a storage/bedroom in the house other than the room in which the gun box and loaded magazines were found, the Court finds that detail—unsupported and contested [ECF No. 72 p. 13]—insufficient to defeat probable cause under the totality of the circumstances. Detective Walker did not violate the Fourth Amendment by neglecting to add these additional details.[10]

### 3. The warrant sufficiently authorized law enforcement to search the Nissan on the property in which Defendant was located upon his arrest.

Defendant's other main challenge to the search warrant is rooted in the particularity requirement of the Fourth Amendment [ECF No. 63 p. 12].  According to Defendant, assuming the warrant properly authorized a search of the residence, it did not authorize a search of the Nissan that he was occupying in the backyard of the residence when he was arrested [ECF No. 63 p. 6; ECF No. 63 pp. 10, 12 (arguing that state judge, by "extending the warrant to areas outside the four corners of the application," turned the search into an "unlawful general search of areas not listed in the application with no nexus to criminal activity and no probable cause to believe evidence would likely be found therein")].  The government opposes the motion on the following grounds: (1) the warrant application articulated sufficient probable cause to authorize the search of conveyance on the property; (2) the warrant granted such authority in a manner consistent with the warrant application; and (3) a reasonable officer acting in good faith would have reasonably relied on the warrant in conducting the search, rendering the exclusionary rule inappropriate under *Leon* [ECF No. 69].

Although the affidavit could have benefited from more information as to the Nissan

---

[10] Defendant also identifies other omissions that he believes warrant suppression, including that Detective Walker did not specify the timing of the photograph referenced in the affidavit and did not include Knight's statement to law enforcement that her brother also stays in the house [ECF No. 67].  The Court has reviewed the full panoply of Defendant's omission-based arguments and concludes that such additional items constitute, at most, negligent omissions and do not, in any event, defeat probable cause calculus sufficient to invalidate the warrant.

specifically, based on the language of the affidavit as a whole, the Court concludes that it contained sufficient probable cause to believe that the Nissan would contain evidence of Defendant's illegal possession of firearms or ammunition.  Alternatively, any doubt on the existence of probable cause for the Nissan does not warrant exclusion in this case, because the search warrant itself reasonably authorized a search of the curtilage and conveyances on the property [ECF No. 90-4], and officers conducted the search of the Nissan in objectively reasonable reliance on the warrant.  *Leon*, 468 U.S. at 922.

To begin, the Court agrees with the government that there was enough information under the totality of the circumstances for the reviewing judge to find that probable cause existed to search the Nissan [ECF No. 69 p. 9].  "Probable cause is not a high bar," *D.C. v. Wesby*, 138 S. Ct. 577, 586 (2018); it requires only a "fair probability" that evidence of a crime will be found in a particular place, *Gates*, 462 U.S. at 238.  That standard is satisfied here.  The affidavit states, as relevant here, that (1) officers went to the subject address to execute an arrest warrant for aggravated assault with a deadly weapon; (2) Defendant was "located . . . *sitting in a vehicle that was located in the backyard*"; (3) a "FN gun box" was located in plain sight inside the residence; (4) Defendant "does stay" in the residence; and (5) law enforcement had received a photograph of Defendant possessing in his pocket what appeared to be a FN H FiveSeven pistol [ECF No. 90-3 (emphases added)].  In addition, although Defendant is correct that the affidavit principally focuses on the "target residence" and the "target house to be searched," it also contains some broader language reasonably encompassing the Nissan—including, for example, references to (1) a search of the "premises," (2) probable cause to believe that evidence of crimes will be found "in/about" the residence; and (3) to a search of the "residential dwelling . . . along with any persons, conveyances and/or containers found therein" [ECF No. 90-3].  For these reasons, based on the content of the affidavit, a reviewing judge reasonably could have concluded that the car in which

Defendant was located on the date of the arrest on the property of the residence would contain evidence of his illegal firearms possession. *See United States v. Singer*, 970 F.2d 1414, 1418 (5th Cir. 1992) (holding that a warrant authorizing a search of "the premises" includes vehicles parked on the premises and citing cases that held the same). This conclusion conforms to the ultimate language of the search warrant itself, which also uses the term "premises" and then explicitly authorizes entry and search of the "residence, curtilage, outbuildings, and conveyances" [ECF No. 90-4 p. 2].[11]

Defendant's attempt to overcome *Leon* fails [ECF No. 81]. Defendant says the affidavit is "so lacking in probable cause to render official belief in its existence entirely unreasonable." *Leon* 468 U.S. at 923. That argument is unpersuasive for the reasons stated above. Defendant also says the issuing judge "abandoned his judicial role" by authorizing a search of the curtilage and conveyances on the curtilage—turning the warrant into what Defendant claims is a "general search for all places for anything law enforcement could find" [ECF No. 81 p. 7]. This exaggerates the record and the scope of the warrant. The affidavit specifies that law enforcement is investigating illegal firearm/ammunition possession by a convicted felon and then lists the evidence it seeks, including firearms, ammunition, indicia of occupancy, and containers reasonably capable of containing firearms/ammunition/indicia of occupancy [ECF No. 90-3]. It does not authorize a "general search for all places" [ECF No. 90-3], and it contains a sufficiently particular description to "enable[] the searcher to reasonably ascertain and identify the things authorized to be seized." *Wuagneux*, 683 F.2d at 1348. The Court rejects the suggestion that the issuing judge "wholly abandoned" his judicial role in the manner condemned by *Lo-Ji Sales, Inc. v. New York*, 442 U.S.

---

[11] Defendant also makes the subjective argument that Detective Walker did not specifically intend, when he was drafting the affidavit on scene, to cover the Nissan. Accepting that as true does not change the probable cause analysis, however, which remains an objective inquiry. *See, e.g.*, *Wesby*, 138 S. Ct. at 585.

319, 322 (1979) (suppressing evidence seized from adult film store where warrant pursuant to which search was conducted purported to encompass similar obscene items but then failed to list those items at all).  The affidavit contained sufficient probable cause to authorize a search of the Nissan on the premises, and the issuing judge reasonably considered that amalgam of facts in authorizing the warrant.[12]  Thus, to the extent any question remains as to the existence of probable cause to search the Nissan specifically, the good-faith *Leon* exception applies.  The harsh remedy of exclusion is not warranted.[13]

As a final point, the Court rejects two arguments advanced by the Government related to the search of the house and car, respectively.  The government argues that Defendant has failed to articulate a possessory interest in the residence sufficient to challenge the search of the house [ECF No. 72 pp. 7–8].  That suggestion is refuted by the record, which indicates (1) that the government found Defendant's personal items in the house, including music equipment consistent with his occupation as a rap artist; (2) that 3706 Avenue K was a known address for Defendant based on prior interactions with law enforcement; and (3) that Defendant stayed at the house more frequently than a mere house guest.  The Court also finds an insufficient basis in the record to entertain Defendant's inevitable discovery argument based on whatever actions Enterprise may or may not have taken vis a vis the Nissan [ECF No. 72 pp. 17–18].

### B. Defendant's Motion to Suppress Evidence Obtained from Defendant's iPhone Searched Pursuant to State Search Warrant Dated July 13, 2020 [ECF No. 33; ECF No. 41 (amendment to ECF No. 33)]

Defendant's motion to suppress the evidence obtained from a search of his phone is due to

---

[12] *See Chambers v. Maroney*, 399 U.S. 42, 48 (1970) (considering automobiles to be "conveyances"); *United States v. Jenkins*, 124 F.3d 768, 773 (6th Cir. 1997) (finding the defendant's backyard to be part of the "curtilage").

[13] To the extent Defendant challenges *Leon* on the basis of what Defendant claims to be intentional, reckless, or flagrant misstatements/omissions, that argument fails for the reasons discussed above.

be denied as well [ECF No. 33 p. 3; ECF No. 41].  The phone at issue is a black iPhone searched on July 13, 2020, following Defendant's arrest on July 9, 2020, for illegal possession of a firearm [ECF Nos. 40-1, 40-2].  The particular evidence is not fully itemized in the record, but the parties have represented in pre-trial motions that it includes photos of Defendant possessing firearms and chats/texts regarding same [*see* ECF Nos. 62, 78].

In the motion, Defendant raises a particularity challenge to the affidavit in support of the warrant, urging that it lacks a sufficient nexus between the suspected criminal activity and the phone [ECF No. 33 p. 4].  Defendant also argues that any probable cause in the affidavit was stale by the time it was issued on July 9, 2020, because it was based on an alleged aggravated assault with a firearm that took place approximately on May 31, 2020 [ECF No. 33 pp. 10–11].  Finally, Defendant characterizes the search warrant as a "fishing expedition" with no "limiting language" [ECF No. 33 pp. 12–13].

Suppression of the evidence seized from Defendant's phone is not warranted.[14]

First, the record does not support Defendant's suggestion that the affidavit "failed to establish how and why the phone would have incriminating information against Mr. Bryant with any particularized facts" [ECF No. 33 p. 8].  Instead, reviewing the affidavit as a whole, it established a fair probability that Defendant's iPhone would contain the evidence Detective Stotler identified in the affidavit—evidence in Defendant's iPhone "that shows a further connection to the FN Five-Seven handgun, further firearms, ammunition, the above listed crimes in Osceola County and/or the historical location data placing Ronell Bryant and Shane Cole in Osceola County during

---

[14] Defendant amended his motion to add a "bad faith" argument in opposition to *Leon*, but Defendant did not request a *Franks* hearing in his motion to suppress the contents of the cell phone [ECF Nos. 33, 41].  In any event, to the extent Defendant argued this aspect of his motion in the lens of *Franks*, the Court does not believe that Defendant has made the substantial preliminary showing required to warrant an additional *Franks* hearing as to the veracity of Detective Stotler's statements in the affidavit.

the above listed incident" [ECF No. 40-1 p. 5].

This is so for the following reasons. Most critically, the affidavit recounts Detective Stotler's observation in June 2020 of a photograph on Defendant's public social media page (post-dated June 21, 2020) of Defendant sitting in a sedan possessing what appears to be a FN Five-Seven handgun [ECF No. 40-1 p. 3]. In other words, Defendant used his own public social media page connected with his "stage name" "Polo Bryant" to post, on June 21, 2020, an image depicting his illegal possession of a firearm [ECF No. 40 p. 8]. Such close-in-time public dissemination on social media by Defendant's "stage name" supports the issuing judge's determination that Defendant's iPhone would contain additional images or communications corroborating and or supplementing Defendant's illegal firearm possession.[15]

Beyond Defendant's highly relevant social media post displaying his gun possession, the affidavit refers to the May 31, 2020 incident in Osceola County. During that alleged incident, Defendant committed an aggravated assault with a firearm by retrieving a black/dark gun from his car and shooting it at the victim on scene [ECF No. 40-1 p. 3]. While that fact that does not tie directly to Defendant's cell phone, it adds further detail about Defendant's firearm possession and use. Additionally, the affidavit states that, when law enforcement searched the 3706 Avenue K residence on July 9, 2020, they saw in plain sight a FN gun box in an open closet and then found a loaded FN Five-Seven handgun in the trunk of the Nissan sedan that Defendant was occupying along with a receipt with Defendant's name on it in the same bag as the gun [ECF No. 40-1 p. 4].

---

[15] Defendant makes much of the fact that the record does not reveal the date on which the photograph was taken—just the post-date of June 21, 2020. The Court does not find this distinction to be legally significant to the probable cause analysis. Defendant chose to post an image of himself on his public, unrestricted social media page possessing what appeared to be a FN Five-Seven handgun while sitting in a car. That fact reasonably supports the determination that a fair probability exists of finding evidence of illegal gun possession in his smart phone, which common sense indicates is a now-common tool to post photographs and engage with social media. Courts need not dispense with common sense in evaluating the validity of warrants. *See generally Gates*, 462 U.S. at 236-37 & n.10.

This fact, combined with Defendant's posting of a social media image of himself in a sedan possessing what appeared to be possessing a FN Five-Seven handgun, also contributes to the fair probability that Defendant's iPhone would contain other images of that same activity and or other evidence connecting him to possession of the FN Five-Seven handgun and/or the Osceola incident.

On the basis of those facts—combined with the now rather ubiquitous reality that people carry their smart phones and incorporated cameras daily and use them to memorialize their daily activities—is sufficient on this record to provide a nexus between Defendant's iPhone and the affidavit's description of the suspected criminal activity.

Defendant's characterization of the warrant as an overly broad "fishing expedition" is similarly insufficient to warrant exclusion. The affidavit (1) listed the particular Florida crimes relevant to the warrant (possession of a firearm by a convicted felon, aggravated assault with a deadly weapon, use of a firearm during a felony, discharging a firearm in public, and battery) [ECF No. 40-1 pp. 1, 3] (2) identified the types of digital data to be searched by specifying the request for evidence "that shows a further connection to the FN Five-Seven Handgun, further firearms, ammunition, the above listed crimes in Osceola County and/or the historical location data placing Ronell Bryant and Shane Cole in Osceola County during the above listed incident" [ECF No. 40-1 p. 5]; and (3) then listed in more detail the particular types of data to be sought [ECF No. 40-1 p. 5 (listing phone numbers, way points, GPS locations, Wi-Fi hotspots, etc.)]. Although reasonable minds can disagree about additional particularity and restrictions that could have been incorporated into the warrant to further limit its scope—including, for example, more explicit time restrictions for the search of the phone—the Court agrees with the government that the warrant application as written does not amount to the type of general warrant condemned by the Fourth Amendment [ECF No. 40 pp. 8–9]. *See United States v. Harry, No. 3:21CR98 (JBA)*, 2022 WL 343963 (D. Conn. Feb. 4, 2022); *United States v. Hardwick*, No. 1:18-CR-398-AT-JFK,

2019 WL 7838970, at *12 (N.D. Ga. June 7, 2019), *report and recommendation adopted*, No. CV 1:18-CR-0398-AT-1, 2020 WL 359009 (N.D. Ga. Jan. 22, 2020).

Nor is there merit to Defendant's staleness challenge. Defendant claims that the warrant was rendered stale because it was based in part on an alleged aggravated assault that took place 39 days before Defendant was arrested with his phone [ECF No. 33 pp. 9–10]. Yet Defendant offers no authority supporting the conclusion—as a matter of the Fourth Amendment—that such a length of time implicates staleness concerns. Nor is it clear to the Court that 39 days even accurately reflects the relevant timeline, as Defendant's public social media image was posted on June 21, 2020—roughly only two-and-a-half weeks before the July 9, 2020 arrest.

Finally, there is the matter of the good-faith *Leon* exception, which the Court finds applicable in the event any doubt were to arise regarding the validity of the warrant. Defendant relies on two "exceptions" to the *Leon* rule of good faith, neither of which the Court finds warrant invalidation of the warrant.

Defendant urges that the affidavit is "so facially deficient" in its lack of particularity that good faith should not prevent exclusion [ECF No. 33 p. 13]. The Court disagrees. Even if the warrant arguably is unconstitutionally overbroad in seeking unrestricted categories of information on Defendant's phone—a premise the Court considers inconsistent with the language of the warrant application—the warrant still is not so facially overbroad such that executing officers could not reasonably have relied on it in executing the search of the iPhone. As noted above, and mindful of the privacy interests inherent in modern cell phones, the affidavit delineated the particular offenses at issue; tied those to particular criminal activity; and then sought evidence specifically connecting Defendant to that alleged criminal activity.

Defendant also advances a "bad faith" argument under *Leon*, pointing to various alleged material statements or omissions in the affidavit in support of the warrant [ECF No. 41].

Defendant cites, for example, the affidavit's references to the 3706 Avenue K address as "his" residence, noting that the residence is his mother's residence [ECF No. 41 p. 1]. This claim fails because (1) the record does not preponderate in favor of a finding of deliberate or intentional falsehoods on the part of law enforcement in this case, and (2) in any event, excising this "residence" point from the search warrant as to the cell phone would not negate the probable cause as to the cell phone because there was independent other specific information in the cell phone affidavit—i.e., Defendant's close-in-time social media post as discussed—to clear the probable cause threshold as to the phone. Further, while it is true that Defendant's mother (Knight) resides at the residence, it is also the case that Defendant had stayed there, most recently about a week before his arrest at the residence, and had kept personal belongings there (including his rap artist equipment for his work). The record also shows, via the credible testimony of various law enforcement officers, that Defendant had been associated with that residence for some time (including in the arrest warrant that initiate this case). Under these circumstances, the affiant's reference to 3706 Avenue K as "his residence" does not evince bad faith sufficient to overcome *Leon* or to raise the specter of a *Franks* violation.

The Court also has reviewed the additional alleged misstatements cited by Defendant as evidence of purported bad faith in the cell phone application and finds them wanting [ECF No. 41 pp. 2–3].

Defendant notes, for example, that his cousin is the actual purchaser of the FN Five-Seven handgun at issue and that his cousin arrived on scene and claimed ownership of the gun— information not contained in the affidavit. Those considerations, while relevant for trial purposes, are not essential to an issuing court's consideration of whether there is probable cause to believe that Defendant possessed the firearm. *Adams v. Williams*, 407 U.S. 143, 149 (1972) ("Probable cause does not require the same type of specific evidence of each element of the offense as would

be needed to support a conviction."). More fundamentally, the inquiry under *Leon*'s deliberate-falsehood exception is whether law enforcement omitted this information to deliberately or recklessly mislead the issuing judge—not whether the affiant included in the affidavit every piece of relevant information gathered in the course of an investigation.

Similarly, Defendant questions the relevance to including in the affidavit details about the caliber casings found at the Osceola incident—claiming "no correlation between the caliber casings in Osceola [.40 and .380] and any ammunition or firearm found in the leased car or the residence [5.7]") [ECF No. 41 p. 3 (describing May 31, 2020 aggravated assault incident in Osceola and noting that "Deputies on scene recovered 4 Smith and Wesson .40 caliber shell casings, and 2 Hornady .380 auto shell casings," suggesting the possibility of a "second shooter")]. This is one interpretation of the relevance of the caliber evidence, limited to Defendant's perspective. But the government reasonably explains why that information would, in fact, be relevant to law enforcement's investigative purpose vis-à-vis Defendant's cell phone and not indicative of bad faith: (1) law enforcement was investigating the possibility of two shooters in the Osceola incident—Defendant and his manager Cole (associates reportedly together on May 31, 2020 Osceola incident and July 9, 2020 arrest); and (2) law enforcement openly acknowledged the presence of caliber ammunition in Osceola different from the 5.7 caliber ammunition of a FN Five-Seven handgun, undercutting any suggestion of bad faith [ECF No. 44 p. 3]. Whatever the ultimate value of this evidence, Defendant's criticism of its inclusion in the affidavit for probable cause provides no basis to decline to apply the good-faith exception in *Leon*.

For these reasons, having fully reviewed the record, the Court finds the warrant in support of the search of Defendant's cell phone to be supported by probable cause, sufficiently particular, and not stale, but any question on those matters ultimately would not warrant invocation of the exclusionary rule in light of *Leon*.

CASE NO. 21-14017-CR-CANNON

**CONCLUSION**

Being fully advised, it is **ORDERED AND ADJUDGED** that Defendant's Motions to Suppress [ECF Nos. 33, 63, 67] are **DENIED**.

**DONE AND ORDERED** in Chambers at Fort Pierce, Florida, this 15th day of March 2022.

**AILEEN M. CANNON**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record

40